**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 17-1839**

─────────────

ERGON-WEST VIRGINIA, INCORPORATED,

      Petitioner,

   v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

      Respondent.

─────────────

On Petition for Review of Final Agency Action of the United States Environmental Protection Agency.

─────────────

Argued: December 7, 2017                  Decided: July 20, 2018

─────────────

Before NIEMEYER and AGEE, Circuit Judges, and Paula XINIS, United States District Judge for the District of Maryland, sitting by designation.

─────────────

Petition for review granted, final agency action vacated, and remanded for further proceedings by published opinion. Judge Agee wrote the opinion, in which Judge Niemeyer and Judge Xinis joined.

─────────────

**ARGUED:** Jonathan Grant Hardin, PERKINS COIE LLP, Washington, D.C., for Petitioner. Patrick Reinhold Jacobi, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** LeAnn M. Johnson, PERKINS COIE LLP, Washington, D.C., for Petitioner. Jeffrey H. Wood, Acting Assistant Attorney General, Environmental and Natural Resources Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Susan Stahle, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Washington, D.C., for Respondent.

AGEE, Circuit Judge:

Until 2011, Ergon-West Virginia, Inc. enjoyed an exemption as a small refinery from the Environmental Protection Agency's renewable fuel standard program, which requires refineries and other facilities to allocate a certain percentage of their fuel production to renewable fuels. When Ergon filed for an extension of the small refinery exemption, the EPA denied its petition on the basis that Ergon's participation in the program would not constitute a disproportionate economic hardship. Ergon petitions the Court for review of the EPA's denial. Because we conclude that the EPA's decision was arbitrary and capricious, we grant Ergon's petition for review, vacate the EPA's denial, and remand for further proceedings.

I.

We begin with the renewable fuels statute and its history and then turn to the proceedings in this case.

A.

With the Energy Policy Act of 2005, Congress added the renewable fuel standard program (the "RFS Program" or "Program") as Section 211(o) of the Clean Air Act. *See* 42 U.S.C. § 7545(o). The statute directs the EPA Administrator to promulgate regulations "to ensure that transportation fuel sold or introduced into commerce in the United States (except in noncontiguous States or territories), on an annual average basis, contains at least the applicable volume of renewable fuel, advanced biofuel, cellulosic biofuel, and

biomass-based diesel"[1] required by the Program. *Id.* § 7545(o)(2)(A)(i). Renewable fuels, such as ethanol, are those that are "produced from renewable biomass and that [are] used to replace or reduce the quantity of fossil fuel present in a transportation fuel." *Id.* § 7545(o)(1)(J). Renewable biomass includes natural materials such as crops, trees, and animal byproducts. *Id.* § 7545(o)(1)(I). The regulations apply "to refineries, blenders, distributors, and importers." *Id.* § 7545(o)(2)(A)(iii)(I).

The applicable volumes of renewable fuel, advanced biofuel, cellulosic biofuel, and biomass-based diesel that transportation fuels must contain on an industry-wide basis are found in § 7545(o)(2)(B). For instance, the statute lists the applicable volume of renewable fuel for 2016 as 22.25 billion gallons. *Id.* § 7545(o)(2)(B)(i)(I). To determine the "applicable percentages" of renewable fuel, advanced biofuel, cellulosic biofuel, and biomass-based diesel that a facility must use, the EPA first estimates "the volumes of transportation fuel, biomass-based diesel, and cellulosic biofuel projected to be sold or introduced into commerce in the United States" the following year. *Id.* § 7545(o)(3)(A). The EPA then divides the applicable volume of the particular renewable fuel by the fuel estimate to arrive at the percentage every refinery must meet and publishes it in the Federal Register. *Id.* § 7545(o)(3)(B); 40 C.F.R. § 80.1405. For example, the percentage of renewable fuel for 2016 was 10.10%. 40 C.F.R. § 80.1405(a)(7)(iv). This

---

[1] Although the RFS Program sometimes lists these four fuels separately, it also often terms them all as "renewable fuel," perhaps because the definitions of advanced biofuel, cellulosic biofuel, and biomass-based diesel all refer to those fuels as renewable fuel. *See* 42 U.S.C. § 7545(o)(1)(B), (D), (E); *see also* 40 C.F.R. § 80.1401. The U.S. Department of Energy has called the four fuel categories "'nested' standards." J.A. 19.

percentage—or "renewable fuel obligation"—is "applicable to refineries, blenders, and importers, as appropriate,"[2] and is "expressed in terms of a volume percentage of transportation fuel sold or introduced into commerce in the United States." 42 U.S.C. § 7545(o)(3)(B)(ii). A refinery will multiply the percentage by the volume of nonrenewable fuel that it produces or imports to determine its "renewable volume obligation." 40 C.F.R. § 80.1407.

All renewable fuels are identified by a renewable identification number ("RIN"), which "is a unique number generated to represent a volume of renewable fuel." 40 C.F.R. § 80.1401. An obligated party must "separate" a sufficient number of RINs (i.e., blend the renewable fuel with nonrenewable fuel) to demonstrate compliance with the Program. *See id.* §§ 80.1427–80.1429; *see also* 42 U.S.C. § 7545(o)(5) (establishing a credit program for blending renewable fuels with transportation fuels). If the obligated party fails to separate the required number of RINs, it can purchase separated RINs from a party who has separated more RINs than it needs and thereby avoid violating the Program's requirements and incurring penalties. *See* 40 C.F.R. §§ 80.1428, 80.1460(c)(1); *see also* 42 U.S.C. § 7545(o)(5)(B) (stating that "[a] person that generates credits . . . may use the credits, or transfer all or a portion of the credits to another person, for the purpose of complying with [the Program]").

From 2005 until 2011, small refineries—those "for which the average aggregate daily crude oil throughput for a calendar year . . . does not exceed 75,000 barrels," 42

---

[2] Despite the statute's instruction, the EPA defines an "obligated party" under the RFS Program as a refiner or importer and specifically exempts blenders. 40 C.F.R. § 80.1406(a)(1).

U.S.C. § 7545(o)(1)(K); *see also* 40 C.F.R. § 80.1442—were exempt from the Program, 42 U.S.C. § 7545(o)(9)(A)(i); *see also* 40 C.F.R. § 80.1441. The statute directed the Secretary of the Department of Energy to "conduct for the [EPA] Administrator a study to determine whether compliance with the [Program's] requirements . . . would impose a *disproportionate economic hardship* on small refineries." 42 U.S.C. § 7545(o)(9)(A)(ii)(I) (emphasis added). If the DOE determined that a given refinery would experience disproportionate economic hardship, then the EPA Administrator was required to extend the facility's exemption for at least two years. *Id.* § 7545(o)(9)(A)(ii)(II). After this first mandatory extension period, the statute provides that a facility may petition the EPA for extension of the exemption "at any time" due to disproportionate economic hardship. *Id.* § 7545(o)(9)(B)(i). This petition "must specify the factors that demonstrate a disproportionate economic hardship and must provide a detailed discussion regarding the hardship the refinery would face in producing transportation fuel meeting the [Program's] requirements." 40 C.F.R. § 80.1441(e)(2)(i). In evaluating the petition, the EPA—"in consultation with" the DOE—must "consider the findings of the [DOE's] study . . . and other economic factors." 42 U.S.C. § 7545(o)(9)(B)(ii).

B.

In 2009, the DOE presented the EPA with the Small Refineries Exemption Study (the "2009 Study"), as required by 42 U.S.C. § 7545(o)(9)(A)(ii)(I). The 2009 Study recognized that "[o]bligated parties, such as refineries, may fulfill their renewable fuel requirements through either blending renewable fuels into their products or purchasing

6

credits from other parties who have exceeded their allocation of renewable fuel consumption." J.A. 15. The DOE determined that, "[a]s long as credits are available for purchase and the market is competitive, small refineries should not be subject to disproportionate economic hardship from their choice to purchase credits rather than to generate them." J.A. 15.[3] The 2009 Study concluded that the general small refinery exemption should not be extended beyond 2010, based largely on its determination that "credits are available at a nominal value and compliance volumes have been in excess of the RFS requirements." J.A. 16.

Unsatisfied with this result, Congress directed the DOE to conduct a new, more in-depth analysis.[4] The DOE released this new study in 2011 (the "2011 Study"). The 2011

---

[3] The 2009 Study did recognize, however, that "[i]t [was] too early to project whether [RIN] markets will continue to be liquid and competitive." J.A. 27.

[4] Congress provided this directive in a Senate report, stating the following:

   The January 2009 Small Refineries Exemption Study issued by the Department of Energy was intended to determine whether small refineries faced a disproportionate economic hardship in meeting Renewable Fuel Standard [RFS] requirements beginning in 2011. The Committee understands the study contained inadequate small refinery input, did not assess the economic condition of the small refining sector, take into account regional factors or accurately project RFS compliance costs. Therefore, the Committee does not believe the study is complete, nor is the Department able to make the required determination at this time. In view of these deficiencies and the importance of the study, the Department is directed to reopen and reassess the Small Refineries Exemption Study by June 30, 2010. The Department is specifically directed to seek and invite comment from small refineries on the RFS exemption hardship question, assess RFS compliance impacts on small refinery utilization rates and profitability, evaluate the financial health and ability of small refineries to meet RFS requirements, study small refinery impacts and regional dynamics by PADD, and reassess the accuracy of small refinery compliance costs through the purchase of renewable fuel credits. Finally, the Committee notes that the 2009 study does not estimate the price of tradable fuel credits, but the Committee is aware that from 2008 to 2009, price has increased nearly threefold. The Committee expects the

(Continued)

7

Study defined disproportionate economic hardship as "increased cost of compliance to the point that the current or future viability of the refinery is impacted." J.A. 47. The DOE recognized that:

> [s]mall refineries can suffer disproportionate economic hardship from compliance with the RFS program if blending renewable fuel into their transportation fuel or purchasing RINs increases their cost of products relative to competitors to the point that they are not viable, either due to loss of market share or lack of working capital to cover the costs of purchasing RINs.

J.A. 47.[5] After conducting a survey of small refineries, the DOE created a scoring matrix composed of two indices—the "Disproportionate Impact Index" and the "Viability Index"—to be used to determine whether a small refinery suffers disproportionate economic hardship:

---

> Department to undertake an economic review to estimate the actual economic impact of the RFS on small refineries on a regional basis.

S. Rep. No. 111-45, at 109 (2009).

[5] The EPA later disagreed with the DOE's statement that purchasing RINs may put a small refinery at an economic disadvantage, stating the following:

> EPA notes that after further review, contrary to statements in [the 2011 Study], it has been found that a refinery does *not* experience disproportionate economic hardship simply because it may need to purchase a significant percentage of its RINs for compliance from other parties, even though RIN prices have increased since the DOE study, because the RIN prices lead to higher sales prices obtained for the refineries' blendstock, resulting in no net cost of compliance for the refinery.

J.A. 317.

8

## Table 10. Disproportionate Structural Impact Metrics

| 1 | **Disproportionate Structural Impact Metrics** | | |
|---|---|---|---|
| a | Access to capital/credit | | 0 = Good access (BB- or above credit rating), 5 = Moderate access (rating in B's) 10 = Poor access (C rating or 50% D/E) |
| b | Other business lines besides refining and marketing | | 0 = Other Lines, 10 = No Other Lines |
| c | Local market acceptance of Renewables | | 0 = Products accepted, 10 = Product not accepted |
| | i | E10 | 0 = High acceptance, 5 = Low acceptance 10= No acceptance |
| | ii | E85 | Not scored because of small E85 volumes |
| | iii | Biodiesel | Not available |
| d | Percentage of diesel production | | 0 = D/(G+D) < Industry Avg. 5 = D/(G+D) > Ind. Avg<40%. 10=D/(G+D) > 40% |
| e | Subject to exceptional state regulations | | 0 = not subject, 5= Some barriers for compliance 10 = subject to exceptional state regulations |
| | | | |
| 2 | **Disproportionate Economic Impact Metrics** | | |
| a | Relative refining margin measure | | 0 = Above 3 year industry average 5 = positive, and below 3 year industry average 10= Negative, 3 average, |
| b | Renewable fuel blending (% of production) | | |
| | i | Ethanol blending | 0 = 75%+, 5 = 25-74%, 10 = <25% |
| | ii | Biodiesel blending (not used) | 0 = 1.1% of diesel production, 1 = <1.1% |
| | iii | Other Advanced Biofuel blending (not used) | 0 = some blending, 10 = no blending |
| c | In a niche market | | 0 = niche 5 = moderate niche impact 10 = no niche |
| d | RINs net revenue or cost | | 0 = revenue > cost, 10 = revenue < cost |
| | Subtotal | | |
| | | | |

**Table 11. Viability Metrics**

| 3 | Viability Metrics | |
|---|---|---|
| a | Compliance cost eliminates efficiency gains (impairment) | 0 = no impact on efficiency,<br><br>10 = impact on efficiency |
| b | Individual special events | 0 = no special event,<br><br>10 = special event impacting viability |
| c | Compliance costs likely to lead to shut down | 0 = not likely to shut down,<br><br>10 = likely to shut down |
| | Subtotal | |
| | | |

J.A. 82, 85.

In Section 1(a) of the Disproportionate Impact Index, the DOE assesses the small refinery's access to capital and credit, primarily through its credit rating. Section 1(b) considers a refinery's business lines other than refining and marketing—"in particular upstream operations such as exploration and development that are less correlated with refining"—which may insulate the refinery from the volatility of refining margins. J.A. 83. Section 1(c) accounts for the refinery's geographic location by evaluating how likely the local market will accept transportation fuels blended with renewable fuels. Although the category lists subcategories for E10 (a fuel mixture of 10% ethanol and 90% gasoline), E85 (a fuel mixture of 85% ethanol and 15% gasoline), and biodiesel, the latter two are "[r]eserved for later evaluation." J.A. 83. Section 1(d) evaluates a refinery's percentage of diesel production in recognition of the fact that "refineries that disproportionately favor diesel production over gasoline inherently have a more difficult compliance pathway, as the percentage of renewable fuel available to blend into diesel is much lower than the 10 percent of ethanol that can be blended into gasoline." J.A. 83.

10

Section 1(e) contemplates abnormally strict state regulations, such as those states that "require refiners to sell unblended fuel." J.A. 83.

In Section 2(a), the DOE scores the refinery for its relative refining margin—essentially its refining revenue minus its refining costs, or refining profit—compared to the three-year industry average. Section 2(b) evaluates the capacity of the refinery to blend its nonrenewable fuels with renewable fuels, with a lower capacity indicating greater impairment. Although Section 2(b) has subcategories of ethanol, biodiesel, and advanced biofuels, only the first is scored, with the others "[r]eserved for later evaluation." J.A. 84. Section 2(c) considers whether a refinery operates in a niche market—such as a refinery that is located in a region "with limited alternative finished product supply or access to distressed crude oil supply" or one that produces "a specialty slate of products" like "lube oils, greases, asphalt, etc." in addition to transportation fuels—as the refinery's participation in the niche market may "result in higher than industry refining margins." J.A. 84. In Section 2(d), the DOE determines whether the refinery generates revenue by selling RINs or must purchase RINs in the market. The 2011 Study stated that "[t]his criterion was not utilized in the current assessment due to lack of consistency among the survey participants." J.A. 84.

The Viability Index analyzes "the ability of the refiners to remain competitive and profitable" while complying with the Program. J.A. 85. In Section 3(a), the DOE determines the degree to which a facility's cost of compliance impairs its ability to make efficiency improvements. Section 3(b) accounts for any events such as a temporary shutdown that may prevent the facility from fully complying with the RFS Program's

requirements. Section 3(c) evaluates the likelihood that compliance costs will cause a refinery to shut down.

The DOE averages the scores in a given index and divides the average by 2. A refinery is entitled to an exemption if it achieves a score greater than 1 in both indices. To obtain this score, a facility must earn "a score equivalent to at least four of the eight metrics for disproportionate impact at the moderate level (5)" and "a positive value for at least one of the three metrics for" the Viability Index. J.A. 86.

In 2015, Congress directed the DOE "to recommend to the EPA Administrator a 50 percent waiver of RFS requirements" if a refinery reaches the requisite score on only one of the two indices. 161 Cong. Rec. H10,105 (daily ed. Dec. 17, 2015). Congress also stated the following:

> The [DOE] Secretary is reminded that the RFS program may impose a disproportionate economic hardship on a small refinery even if the refinery makes enough profit to cover the cost of complying with the program. Small refinery profitability does not justify a disproportionate regulatory burden where Congress has explicitly given EPA authority, in consultation with the Secretary, to reduce or eliminate this burden.

*Id.*

Finally, in December 2016, the EPA issued a memorandum that detailed how it evaluates small-refinery-exemption petitions. The EPA "considers the findings of the DOE Small Refinery Study and a variety of economic factors." J.A. 201. Some of those factors include "profitability, net income, cash flow and cash balances, gross and net refining margins, ability to pay for small refinery improvement projects, corporate structure, debt and other financial obligations, RIN prices, and the cost of compliance

12

through RIN purchases." J.A. 201. Petitioning facilities include financial information with their petitions to aid the EPA in its analysis.

C.

Ergon owns a refinery in Newell, West Virginia, with a maximum crude oil capacity of 23,000 barrels per day, well under the small refinery threshold. The facility primarily produces paraffinic lube oils, and the transportation fuels it produces are byproducts of that lube oil production.[6] Nearly all (99%) of Ergon's transportation fuels are sold within a 170-mile radius of the facility.

In April 2016, Ergon filed a petition with the EPA for a small refinery exemption for compliance years 2014, 2015, and 2016. In its petition, Ergon claimed that it is at an economic disadvantage because, while there was a widespread market for blended gasoline, there was no such market for blended diesel. Ergon also claimed that its ability to comply with the Program was limited by its geographic location because customers in Ergon's market chose its main competitor's unblended diesel over Ergon's blended diesel. *See* J.A. 216 ("Because [Ergon] produces diesel at nearly twice the industry average and biodiesel is blended at lower rates than gasoline, [Ergon] generates fewer RINs for compliance than a large, vertically integrated refiner like [Ergon's main competitor].").[7]

---

[6] Approximately two-thirds of the transportation fuel Ergon produces is diesel, with the other third gasoline.

[7] Ergon does have the infrastructure to blend ethanol into its gasoline.

In June 2016, the EPA denied Ergon's petition for years 2014 and 2015. The DOE applied the scoring matrix for those years and concluded that Ergon did not achieve the requisite scores on either the Disproportionate Impact Index or the Viability Index. For both years, the DOE gave Ergon scores of 0 for Sections 1(a), 1(b), 1(c), 1(e), and 2(a) through 2(c) in the Disproportionate Impact Index. However, the DOE gave Ergon a score of 10 for Section 1(d) due to its high level of diesel production. The DOE did not give Ergon a score for Section 2(d)—the "RINs net revenue or cost" factor—because it "has not scored this category for any hardship petition evaluations." J.A. 260. With a total of ten points, the average across the eight scored sections was 1.25. After dividing that figure by 2, Ergon's overall score for the Disproportionate Impact Index was 0.6. The DOE gave Ergon a score of 0 for each of the three sections of the Viability Index, resulting in an overall score of 0. The EPA reviewed the DOE's scoring matrix and "independently determine[d]" that Ergon "w[ould] not experience 'disproportionate economic hardship' from compliance with the RFS program for 2014 and 2015." J.A. 262. In short, the EPA "agree[d] with DOE's determination in reviewing [Ergon's] petition that [Ergon's] 2014 and 2015 RFS compliance costs do not threaten [Ergon's] viability." J.A. 264.

In August 2016, Ergon withdrew its 2016 petition, informed the EPA that it would file a revised petition for that year, and asked the EPA to reconsider its decision for

2015.[8] In December 2016, Ergon submitted the revised petition for the 2016 compliance year. In May 2017, the EPA denied Ergon's 2016 petition for a small refinery exemption. The EPA again relied on the DOE's determination (the "DOE's Report") that Ergon achieved the same deficient scores as in the 2014 and 2015 evaluations:

---

[8] Ergon did not request reconsideration of the 2014 decision "because the compliance deadline ha[d] passed." J.A. 268.

DOE Evaluation of EWV's Petition for 2016

| 1 | Disproportionate Structural Impact Metrics | | Score |
|---|---|---|---|
| a | Access to capital/credit | 0 = Good access (BB- or above credit rating)<br>5 = Moderate access (rating in B's)<br>10 = Poor access (C rating or 50% D/E) | 0 |
| b | Other business lines besides refining and marketing | 0 = Other Lines<br>10 = No Other Lines | 0 |
| c | Local market acceptance of Renewables | 0 = Products accepted<br>10 = Product not accepted | |
| | i     E10 | 0 = High acceptance<br>5 = Low acceptance<br>10= No acceptance | 0 |
| | ii    E85 | Not scored because of small E85 volumes | |
| | iii   Biodiesel | Not available | |
| d | Percentage of diesel production | 0 = D/(G+D) < Industry Avg.<br>5 = D/(G+D) > Ind. Avg. < 40%.<br>10 = D/(G+D) > 40% | 10 |
| e | Subject to exceptional state regulations | 0 = not subject<br>5 = Some barriers for compliance<br>10 = subject to exceptional state regulations | 0 |
| | | | |
| 2 | Disproportionate Economic Impact Metrics | | |
| a | Relative refining margin measure [33] | 0 = Above 3-year industry average<br>5 = Positive, below 3-year industry average<br>10= Negative | 0 |
| b | Renewable fuel blending (% of production) | | |
| | i     Ethanol blending | 0 = 75%+, 5 = 25-74%, 10 = <25% | 0 |
| | ii    Biodiesel blending (not used) | 0 = 1.1% of diesel production<br>1 = <1.1% | |
| | iii   Other Advanced Biofuel blending (not used) | 0 = some blending<br>10 = no blending | |
| c | In a niche market | 0 = niche<br>5 = moderate niche impact<br>10 = no niche | 0 |
| d | RINs net revenue or cost [34] | 0 = revenue > cost<br>10 = revenue < cost | |
| | Subtotal (average) | | 1.3 |
| | **Ranking (subtotal x 0.50)** | | **0.6** |
| 3 | Viability Metrics | | |
| a | Compliance cost eliminates efficiency gains (impairment) | 0 = no impact on efficiency<br>5 = moderate impact<br>10 = impact on efficiency | 0 |
| b | Individual special events | 0 = no special event<br>5 = moderate event<br>10 = special event impacting viability | 0 |
| c | Compliance costs likely to lead to shut down | 0 = not likely to shut down<br>10 = likely to shut down | 0 |
| | Subtotal (average) | | 0.0 |
| | **Ranking (subtotal x 0.50)** | | **0.0** |

J.A. 326–27. Unlike the 2014 and 2015 denials, however, the EPA did not focus on Ergon's viability specifically in its denial of the 2016 petition.

Ergon filed a timely petition for review of the EPA's final agency action regarding only the 2016 petition. The Court has jurisdiction pursuant to 42 U.S.C. § 7607(b)(1).

II.

Ergon makes two overarching arguments in its challenge of the EPA's denial of its 2016 petition.[9] First, Ergon argues that the EPA's decision was arbitrary, capricious, and contrary to law because it adopted the DOE's "error-riddled analysis" of Ergon's petition. Opening Br. 23. Second, Ergon contends that the EPA's conclusion was contrary to law insofar as it read an extra-statutory "viability requirement" into § 7545(o)(9)(B)'s "disproportionate economic hardship" determination. While we reject the latter argument, the former is well-taken. We therefore vacate the EPA's decision and remand for further proceedings.[10]

---

[9] At the outset, we reject the EPA's assertion that Ergon has waived some of its legal arguments because it did not raise them during the administrative process. We fail to see how Ergon could have raised legal arguments addressing the EPA's alleged errors in denying its petition *before* the EPA had actually denied the petition. Nor do we accept the EPA's contention that Ergon should have made those legal arguments within its 2016 petition because it knew the bases for the EPA's denial of its petition for compliance years 2014 and 2015. *See Sinclair Wyo. Ref. Co. v. U.S. EPA*, 887 F.3d 986, 992 (10th Cir. 2017) ("Indeed, the [EPA's] decisions have no precedential value even for the *refiner*, since each petition must be resolved on a case-by-case basis . . . .").

[10] This is a case of first impression in this Court. In fact, the EPA's application of the small refinery exemption has been challenged only three times, with each of those cases focused on the EPA's application of a viability requirement. In *Hermes Consol., LLC v. EPA*, 787 F.3d 568, 574–75, 579–80 (D.C. Cir. 2015), the court rejected a refinery's challenge to the EPA's heavy reliance on the DOE's analysis of its petition, particularly the Viability Index, but it (Continued)

17

## A.

This Court must "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Although we accord substantial deference to an agency's final action and presume it valid, "the arbitrary-and-capricious standard does not reduce judicial review to a rubber stamp of agency action." *Friends of Back Bay v. U.S. Army Corps of Eng'rs*, 681 F.3d 581, 587 (4th Cir. 2012) (internal quotation marks omitted). "Agency action is arbitrary and capricious if the agency relies on factors that Congress did not intend for it to consider, entirely ignores important aspects of the problem, explains its decision in a manner contrary to the evidence before it, or reaches a decision that is so implausible that it cannot be ascribed to a difference in view." *United States v. F/V Alice Amanda*, 987 F.2d 1078, 1085 (4th Cir. 1993).

## B.

Ergon argues that the EPA (1) acted in an arbitrary and capricious manner by "ignor[ing] important aspects of the problem," *F/V Alice Amanda*, 987 F.2d at 1085, in its

---

reversed the EPA's decision due to errors the EPA admitted it made in calculating the refinery's net income and net refining margins. In *Lion Oil Co. v. EPA*, 792 F.3d 978, 982–83, 984 (8th Cir. 2015), the court likewise rejected a refinery's contention that the EPA erred in relying on the DOE's analysis of its petition, with the EPA's denial again focusing on the Viability Index. And in *Sinclair*, the Tenth Circuit found reversible error when the EPA rejected the DOE's recommendation that a refinery receive a 50% waiver of the RFS Program requirements because the EPA had determined that the Program would not affect the refinery's viability. *See* 887 F.3d at 995–99. Again, all of these cases involve the EPA's rejection of the refineries' petitions because it concluded that the RFS Program did not threaten their viability. None of the cases specifically address the Disproportionate Impact Index—primarily the metric at issue here.

reliance on the DOE's analysis of Ergon's 2016 petition; and (2) acted contrary to law in determining that Ergon would not receive a waiver because compliance with the RFS Program would not threaten its viability. We address each argument in turn.

1.

Ergon makes several arguments attacking the DOE's conclusions, but we are limited in our consideration of these arguments. The DOE's Report itself cannot be challenged directly in this case. Ergon did not sue the DOE for issuing its recommendation;[11] rather, it sued the EPA—the action agency—for denying its 2016 waiver petition. Therefore, instead of determining whether the DOE's Report is arbitrary and capricious, we may consider only whether the EPA's *reliance* on the DOE's Report is arbitrary and capricious. *See Dow AgroSciences LLC v. Nat'l Marine Fisheries Serv.*, 637 F.3d 259, 266–67 (4th Cir. 2011) ("When a court of appeals reviews *the EPA's reliance* on a [report issued by another agency], it would determine only whether the EPA's reliance was arbitrary and capricious."); *City of Tacoma v. FERC*, 460 F.3d 53, 75 (D.C. Cir. 2006) ("Accordingly, when we are reviewing the decision of an action agency to rely on [another agency's report], the focus of our review is quite different than when we are reviewing a [report] directly. In the former case, the critical question is whether the action agency's *reliance* was arbitrary and capricious, not whether the [report] itself is somehow flawed."). While the action agency is not required "to undertake an independent analysis" of another agency's conclusions, it may not "blindly adopt [those]

---

[11] We express no opinion on whether such a report might be subject to direct judicial review in a separate action.

19

conclusions." *City of Tacoma*, 460 F.3d at 76. Thus, an action agency's reliance on a facially-flawed report is arbitrary and capricious. *See id.* at 75. With these legal principles in mind, we turn to Ergon's arguments.

2.

Ergon first contends that the DOE erred in scoring two factors within the Disproportionate Impact Index by arbitrarily defining "refining" to Ergon's detriment. In Section 1(b) (the "other business lines besides refining and marketing" factor), the DOE separated Ergon's refining from its lube oil production, considered the latter as an "other business line[] besides refining and marketing," and gave Ergon a score of 0 for this factor. Then, in Section 2(a) (the "relative refining margin" factor), the DOE treated Ergon's lube oil production as refining for purposes of the relative refining margin measure, again resulting in a score of 0. Both of these decisions negatively impacted Ergon's score. Despite this apparent contradiction, however, these arguments go to the DOE's scoring methodology and are not apparent on the face of the DOE's Report. Therefore, we cannot say that the EPA's reliance on the DOE's scoring of these factors was arbitrary and capricious.

3.

Ergon next posits that the DOE erred by failing to score Section 1(c) (the "local market acceptance of renewables" factor), Section 2(b) (the "renewable fuel blending" factor), and Section 2(d) (the "RINs net revenue or cost" factor). The DOE's failure to score these factors is apparent on its face, and Ergon contends that the DOE's arbitrary treatment of these sections actively hurt its petition. Because our analysis of Sections 1(c)

20

and 2(b) differs slightly from that of Section 2(d), we provide separate discussions of these factors below.

a.

In Section 1(c), the DOE accords points depending on the acceptance of renewable fuel in the refinery's local market. There are three subcategories within this factor: E10, E85, and biodiesel renewables. The DOE did not score the latter two subcategories at all in analyzing Ergon's petition and has apparently never scored those subcategories in any refinery's petition. Instead, the DOE gave Ergon's petition a score of 0 for the local market's acceptance of E10, completely disregarding the fact that approximately two-thirds of Ergon's transportation fuel production is diesel, which must be mixed with biodiesel. The DOE treated Section 2(b)—which measures a refinery's capacity for blending renewable fuels with nonrenewable fuels—similarly. Although Section 2(b) has subcategories for ethanol, biodiesel, and advanced biofuel blending, the DOE scored only the first, ignoring Ergon's biodiesel blending and giving Ergon a score of 0 for this category. Had Ergon achieved a score of 10 on either Section 1(c) or Section 2(b), it would have achieved a score greater than 1 and likely earned a small refinery exemption.[12]

_____

[12] The DOE's analysis of Ergon's 2016 petition resulted in a total score of 0.6 for the Disproportionate Impact Index and a total score of 0 for the Viability Index. In the Disproportionate Impact Index, the DOE gave Ergon ten points for Section 1(d) (the "percentage of diesel production" factor) and no points for the other factors. With eight sections in this index (not counting the "RINs net revenue or cost" factor, which the DOE did not score and has never applied to any facility), the average was 1.25. After dividing by 2, the DOE reached the total score of 0.6. Ergon needed a total of twenty points in this Index to achieve a score greater than 1. (Continued)

21

The DOE's treatment of these two factors—Sections 1(c) and 2(b)—is plainly arbitrary as it treats unfairly those facilities where diesel makes up a substantial percentage[13] of their transportation fuel production. For Section 1(c), despite the widespread acceptance of E10 gasoline, a local market may not readily accept diesel blended with biodiesel, placing refineries with higher-than-average production of diesel, like Ergon, at a measurable disadvantage, as the DOE recognized in its 2011 Study. *See* J.A. 71 (noting that, "[i]n most states, biodiesel blending is limited because biodiesel feedstock is expensive and consumer resistance to the blend exists"). Similarly, in Section 2(b), while a facility may have a high capacity to blend ethanol with its nonrenewable fuel, it may not have the same capacity to blend biodiesel, so failing to score this factor again harms those facilities with higher-than-average production of diesel, like Ergon. These errors are readily apparent on the face of the DOE's Report as the index lists "[n]ot available" next to biodiesel in Section 1(c) and "not used" next to biodiesel blending in Section 2(b). J.A. 326. Because the DOE's recommendation was clearly flawed on its face, "a clear error of judgment was made" when the EPA relied without explanation on the DOE's Report for its denial of Ergon's 2016 waiver petition. *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009). In

Had the DOE scored either Section 1(c) or Section 2(b), Ergon likely would have earned at least a partial exemption.

[13] While diesel makes up almost two-thirds of Ergon's transportation fuel production, the industry average is for diesel to constitute less than one-third of a given refinery's transportation fuel production.

22

addition, the EPA did not conduct any independent analysis regarding the subject matter of Sections 1(c) and 2(b).

Nonetheless, the EPA argues that its consideration of the DOE's analysis was only one of several grounds for denying Ergon's petition. To be sure, the EPA stated in its denial letter that it "independently review[ed] the information" and "consider[ed] other economic factors in [its] analysis." J.A. 327. But the extent to which the EPA relied on the DOE's Report and the relative weight of Sections 1(c) and 2(b) are unknown. In its denial letter to Ergon, the EPA stated, "In determining whether [Ergon] will experience disproportionate economic hardship, EPA considers whether compliance with its RFS obligations disproportionately impacts [Ergon]. EPA *generally defers* to DOE's assessment due to DOE's expertise on the refining industry." J.A. 327 (emphasis added); *accord* J.A. 320 ("EPA considers DOE's assessment of whether a small refinery will face disproportionate impacts in complying with its RFS obligations. The DOE analysis informs EPA's finding of whether 'disproportionate economic hardship' exists and in turn EPA's resulting decision about whether to grant or deny a petition for an extension of the RFS temporary exemption for a small refinery."). On this record, we cannot determine whether the EPA would have reached the same conclusion had the DOE submitted a proper analysis or had the EPA addressed the DOE's failure to analyze Sections 1(c) and 2(b). Although the EPA acknowledged that "disproportionate impacts could disadvantage a refinery relative to the industry average and make compliance with RFS obligations relatively more burdensome," it specifically recognized that the "DOE did not find that [Ergon] demonstrated disproportionate economic and structural impacts"

23

(i.e., did not achieve the requisite score in the Disproportionate Impact Index). J.A. 328. Although the EPA is statutorily required to consider the DOE's recommendation, it may not turn a blind eye to errors and omissions apparent on the face of the report, which Ergon pointed out and the EPA did not address in any meaningful way. *City of Tacoma*, 460 F.3d at 76 ("[T]he action agency must not blindly adopt the conclusions of the consultant agency, citing that agency's expertise."). In doing so, the EPA "ignore[d] important aspects of the problem." *F/V Alice Amanda*, 987 F.2d at 1085.

b.

Section 2(d) considers whether a facility generates revenue by selling RINs or suffers costs by purchasing RINs on the market. Like Sections 1(c) and 2(b), the DOE's failure to score this section is apparent on the face of the DOE's Report, and that failure negatively impacted Ergon's petition. Unlike Sections 1(c) and 2(b), however, the EPA's reliance on the DOE's Report regarding Section 2(d) was not arbitrary and capricious in and of itself as the EPA did not rely on that factor in its determination. *See* J.A. 317 (discussing the 2011 Study in general and stating that "EPA notes that after further review, contrary to statements [in the 2011 Study], it has been found [in an EPA study] that a refinery does *not* experience disproportionate economic hardship simply because it may need to purchase a significant percentage of its RINs for compliance from other parties, even though RIN prices have increased since the [2011 Study], because the RIN prices lead to higher sales prices obtained for the refineries' blendstock, resulting in no net cost of compliance for the refinery"). Because the EPA provided a specific response addressing why it did not consider the 2011 Study's conclusions concerning RIN

24

prices—thereby implicitly disregarding the scoring of the factor in the DOE's Report—the EPA's reliance on the DOE's Report as to Section 2(d) was not arbitrary and capricious.

Even so, the EPA's analysis of the effect of RIN prices on Ergon's refining facility was arbitrary and capricious on this record because the EPA ignored specific evidence suggesting that those prices had a negative effect. In that regard, Ergon points out that the EPA's analysis of its RIN costs consists of a solitary statement: "EPA acknowledges that [Ergon] may not be able to satisfy its [Program obligations] exclusively through the blending of ethanol and biodiesel into its gasoline and diesel; however, the mere fact that [Ergon] needs to purchase RINs for compliance does not necessarily entitle [Ergon] to an exemption." J.A. 330. The EPA cites to an EPA study titled "A Preliminary Assessment of RIN Market Dynamics, RIN Prices, and Their Effects" for this conclusion. That study, according to the EPA, merely determined that the refining industry as a whole is not burdened by rising RIN prices because refineries may pass that cost to purchasers of the blended fuel. Ergon's 2016 petition, however, maintains that its refinery cannot pass the RIN costs on to purchasers because of the local market's low acceptance of blended diesel. *See* 161 Cong. Rec. H10,105 (daily ed. Dec. 17, 2015) ("Since [the 2011 Study], the dramatic rise in RIN prices has amplified RFS compliance and competitive disparities, especially where unique regional factors exist, including high diesel demand, no export access, and limited biodiesel infrastructure and production."); J.A. 71 (recognizing in the 2011 Study that, "[i]n most states, biodiesel blending is limited because biodiesel feedstock is expensive and consumer resistance to the blend exists").

25

Insomuch as the EPA cited generally to an industry-wide study and a nonspecific nationwide trend to find that RIN prices would not harm Ergon although Ergon provided specific, contradictory evidence of hardship *particular to its refinery* due to RIN costs, the EPA failed to squarely address Ergon's petition with regards to RIN costs and "explain[ed] its decision in a manner contrary to the evidence before it." *F/V Alice Amanda*, 987 F.2d at 1085. Furthermore, the EPA's disregard for Ergon's RIN arguments appears inconsistent with its statement earlier in the 2016 decision that the EPA considers "RIN prices[] and the cost of compliance through RIN purchases" in making its determination. J.A. 327; *accord* J.A. 201 (explaining in a December 2016 memorandum that the EPA considers "RIN prices[] and the cost of compliance through RIN purchases" in evaluating a petition). Consequently, the EPA's cursory consideration and failure to address Ergon's specific evidence regarding RIN costs was an arbitrary and capricious action. This failure alone warrants granting Ergon's petition for review.

\*\*\*\*

Because the EPA relied on the DOE's facially-deficient recommendation to an unexplained and unknown degree, and because the EPA failed to properly address Ergon's petition with regard to RIN costs, we must vacate the EPA's decision to deny Ergon's 2016 petition as arbitrary and capricious. *See Hermes Consol., LLC v. EPA*, 787

26

F.3d 568, 571 (D.C. Cir. 2015) ("[W]e are unable to conclude that EPA would have reached the same decision absent its mistakes.").[14]

4.

Ergon next argues that the EPA read a viability requirement into the definition of "disproportionate economic hardship"[15] and rejected Ergon's waiver petition primarily because compliance with the RFS Program would not threaten Ergon's viability.[16] Ergon urges us to adopt the Tenth Circuit's reasoning in *Sinclair Wyoming Refining Co. v. U.S. EPA*, 887 F.3d 986 (10th Cir. 2017), and hold that the EPA erred in this case by applying this viability requirement. However, while it does appear that the EPA applied some sort

---

[14] At this time, we neither endorse nor find fault with the remaining grounds that the EPA contends support its denial of Ergon's petition.

[15] The parties dispute whether the Court should accord *Chevron* or *Skidmore* deference to the EPA's interpretation of the term "disproportionate economic hardship" found in 42 U.S.C. § 7545(o)(9). *Compare Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984) (holding that, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute"), *with Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) (holding that a court will determine how much weight to give an agency's rulings "depend[ing] upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control"). We do not decide this standard-of-review question because we otherwise find no merit in Ergon's argument on the issue raised.

[16] Couched within the viability argument section of Ergon's opening brief, Ergon discusses at some length the DOE's allegedly erroneous calculation of the industry average refining margins and comparison of those margins to Ergon's refining margins. From that discussion, Ergon presumably argues that the EPA erred in relying on those figures when assessing Ergon's 2016 petition. Assuming without deciding that blind reliance on the DOE's calculations would constitute per se error, Ergon fails to recognize that the EPA independently calculated the industry average refining margins. *Compare* J.A. 323–24 (the EPA's calculation of three-year average refining margins for the years 2014 through 2016), *with* J.A. 326 (the DOE's calculation of three-year average refining margins for the years 2013 through 2015). Because Ergon does not challenge the EPA's independent calculation, we do not consider Ergon's argument.

27

of viability test in its denial of Ergon's petition for compliance years 2014 and 2015, there is no indication it used a similar viability requirement in the 2016 petition denial—the sole decision of the EPA at issue in this case. *Compare* J.A. 262–65 (2014 & 2015 denial), *with* J.A. 327–30 (2016 denial); *see also* J.A. 320 ("In prior decisions, EPA considered that a small refinery could not show disproportionate economic hardship without showing an effect on 'viability,' but we are changing our approach. While a showing of a significant impairment of refinery operations may help establish disproportionate economic hardship, compliance with RFS obligations may impose a disproportionate economic hardship when it is disproportionately difficult for a refinery to comply with its RFS obligations—even if the refinery's operations are not significantly impaired."). At most, it appears that the EPA considered viability as only one factor in its 2016 decision, which it was permitted to do. *Sinclair*, 887 F.3d at 996 ("If long-term 'viability' was merely *one* element the EPA considered in its 'disproportionate economic hardship' analysis, that would be a different story."). Accordingly, we find no merit to Ergon's contention on this issue.

## III.

For these reasons, we grant Ergon's petition for review, vacate the EPA's decision, and remand the case to the EPA for further proceedings consistent with this opinion.

*PETITION FOR REVIEW GRANTED;*
*FINAL AGENCY ACTION VACATED;*
*REMANDED FOR FURTHER PROCEEDINGS.*

28